UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------X
                                    :
J.E.M. INC.,                        :
                                    :
   Plaintiff,                       :
                                    :
v.                                  : Civ. No. 3:03CV1487(AWT)
                                    :
SENECA INSURANCE COMPANY, INC.,     :
                                    :
   Defendant.                       :
                                    :
------------------------------------X

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff, J.E.M. Inc. ("JEM"), a Connecticut corporation with its principal place of business in Meriden, Connecticut, brings claims against the defendant, Seneca Insurance Company, Inc. ("Seneca"), a New York corporation, alleging breach of contract (First Claim), bad faith (Second Claim), and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. (Third Claim), and also seeking a declaratory judgment (Fourth Claim).

The defendant has moved for summary judgment. For the reasons set forth below, the defendant's motion is being granted as to the first three claims, narrowing the issue to the Fourth Claim.

**I.  Factual Background**

In January 2000, JEM applied to Seneca for an insurance policy for a commercial building located at One King Place,

Meriden, Connecticut (the "Premises"). Seneca issued a policy that provided coverage for, <u>inter alia</u>, property damage for the period February 18, 2000 to February 18, 2001 ("2000-2001 Policy"). When Seneca inspected the Premises, it learned that they were vacant. Consequently, on April 14, 2000, Seneca sent a notice of cancellation to JEM stating that coverage for the Premises would expire on April 26, 2000 because JEM had made a material misrepresentation in the course of obtaining the policy. However, Seneca also advised JEM that it would provide coverage for the Premises if JEM contracted with a private security firm to provide security 24 hours/day, seven days a week and conduct rounds once every eight hour shift. Seneca required that JEM provide it with a copy of the contract for security services prior to April 26, 2000.

In a letter dated April 18, 2000, JEM advised Seneca that the Premises were not vacant. JEM represented that (i) JEM would maintain offices with three full time employees at the site; (ii) John Cimino, the owner of JEM, would have an office in the building; and (iii) there would be a tenant present in one of the smaller buildings at the site. JEM further represented:

> On the issue of security, the City of Meriden provides a continuous off hours presence at the site through a community based policing program which locates a policeman in the parking lot. The policeman is there all non working hours except for those occasions when he receives a call to another scene. You may confirm this by calling the Meriden Police Department and asking to speak to Officer Glen Felton. This item should be sufficient to meet the securities requirements of your communication.

(Bishop Aff. (Doc. No. 18), at Ex. 3).  Based on the representation by JEM that the Meriden Police Department would have a presence at the Premises, Seneca agreed to reinstate the policy and provide coverage for the Premises without requiring that JEM hire a private security firm.

The policy was renewed for the period February 18, 2001 to February 18, 2002 ("2001-2002 Policy"), as well as for the period February 18, 2002 to February 18, 2003 ("2002-2003 Policy"). Immediately prior to the renewal for the period February 18, 2002 to February 18, 2003, JEM again represented to Seneca that the Meriden Police Department had a presence at the Premises.  In a February 13, 2002 memorandum to Seneca from LJF Insurance Services Inc., JEM's insurance broker, the following representation was made:

> There is 24 hour police protection in the building as the Meriden Police Dept. occupies a portion of the building for their detectives and as a substation.

(Bishop Aff. (Doc. No. 18), at Ex. 6).

In addition, when the policy was renewed on February 18, 2002, it contained a Protective Safeguards Endorsement which stated:

> PROTECTIVE SAFEGUARDS
> \*\*\*
> "P-9": DETECTIVE BUREAU OCCUPIES BUILDING SEVEN (7) DAYS A WEEK FOR TWO 8 HOUR SHIFTS.
> 1. The following is added to the:
> Commercial Property Conditions
> \*\*\*
> PROTECTIVE SAFEGUARDS

> a. As a condition of this insurance you are required to maintain the protective devices or services listed in the schedule above.
> b. The protective safeguards to which this endorsement applies are identified by the following symbols:
>
> ***
>
>> "P-3" Security Service, with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.
>
> ***
>
>> "P-9" The protective system described in the schedule.

(Bishop Aff. (Doc. No. 18), at Ex. 5).

On February 15, 2003, a man described in a police report as "homeless" and "intoxicated" broke into the Premises and plugged a toilet on an upper floor with toilet paper, causing the toilet to overflow. This resulted in extensive water damage to several floors of the Premises. At the time of the loss, the Meriden Police Department did not have a presence at the Premises; it had moved from the Premises several months prior to the incident.

In addition, on February 5, 2003, an unknown individual had broken into the Premises, which resulted in a broken window. A similar incident had occurred the following day. On February 10, 2003, a third break-in had occurred, which resulted in a damaged exhaust fan. On February 16, 2003, an emergency door had been destroyed. No claims were made for those incidents.

On March 5, 2003, JEM filed a claim for damage to the Premises resulting from the February 15, 2003 incident. Seneca sent Robert Cicero to investigate the claim. During the course

of his investigation, Cicero spoke with JEM personnel and learned that several months prior to the date of the loss, the Meriden Police Department had moved from the Premises to a different location. On or around March 7, 2003, Cicero informed Seneca that the Meriden Police Department had not had a presence at the Premises at the time of the loss and that it had not had a presence there for at least several months prior to the loss. In response, Seneca mailed a notice of cancellation to JEM on March 11, 2003, canceling the policy for the period February 18, 2003 to February 18, 2004, effective April 13, 2003, because of an "increase in hazard".

After Seneca canceled the policy, JEM's insurance broker advised Seneca, in two memoranda on April 11, 2003, that the Premises were not vacant and were being occupied by three tenants. Upon receiving the first memorandum, Seneca requested specific information about the tenants. In the second memorandum, JEM'S insurance broker provided the name, term of the lease, number of square feet and location of the new tenants. Based on this information, Seneca offered JEM two options for reissuance of the policy. One option was to increase the premium by $440 and also increase the deductible per occurrence; the second was to increase the premium by $10,665 per year with no increase in the deductible. JEM chose the second option, and the defendant re-issued the policy for the period February 18, 2003 to February 18, 2004. The policy incorporated the same Protective

Safeguard Endorsement that was contained in the policy in effect for the period from February 18, 2002 to February 18, 2003.

Subsequent to the re-issuance of the policy for the period from February 18, 2003 to February 18, 2004, Seneca learned that the tenants were not located in the main section of the Premises. Consequently, on June 9, 2003, Seneca canceled the policy.

**II. Legal Standard**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.

Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position"

will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

**III. Discussion**

    A.    <u>JEM Materially Breached the Contract</u>

The Protective Safeguards endorsement appearing in the 2002-2003 Policy, the policy applicable at the time of the February 15, 2003 incident, contains clear and unambiguous[1] language which provides that insurance coverage is contingent upon compliance with the security directives. See Schultz v. Hartford Fire Ins. Co., 213 Conn. 696, 702-03 (1990) ("If . . . the words in the policy 'are plain and unambiguous, the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a

---

[1] "An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." Schultz v. Hartford Fire Ins. Co., 213 Conn. 696, 702 (1990). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous . . . . By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" Goldberg v. Hartford Fire Ins. Co., 269 Conn. 550, 559 (2004). Furthermore, "'any ambiguity . . . must emanate from the language used in the contract rather than from one party's subjective perception of the terms.'" Id. at 559 (citation omitted). Here, the plaintiff has produced no evidence to demonstrate another reasonable interpretation of the contract. Even if the language was ambiguous, a look to the extrinsic evidence would show that Seneca issued its policy in reliance on JEM's maintaining the police presence as represented to Seneca.

forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.'"). See also Standard Fur Cutting Co., 154 A. 153, 155 (Conn. 1931) ("As to compliance with a warranty in a contract of insurance, the general rule is that its terms must be strictly and literally fulfilled or the contract is vitiated."). Here, the plaintiff was obligated to "maintain the protective devices or services" which were described as "detective bureau occupies building seven (7) days a week for two 8 hour shifts." (Bishop Aff., at Ex. 5). The plaintiff has failed to create a genuine issue of material fact as to the applicability of the warranty provision.

Furthermore, JEM concedes that the police had vacated the premises and that there was no guard patrolling the premises in accordance with the Protective Safeguards endorsement.[2] JEM's admitted breach was material[3], as compliance with this provision

---

[2] Cimino testified that the police community office had moved out of the building around "October, September, November" of 2002. (Cimino Dep. at 22). When asked who provided nighttime security to the building from the time the police community office left to [August 14, 2003], he answered, "no one." Id. at 23.

[3] To determine whether a breach is material, Connecticut courts take into account factors from the Second Restatement of Torts, at section 241: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the

-9-

was a "condition" of insurance and clearly a security presence in or around a building is material to an insurer's determination of its potential risk of loss and the applicable premium. See Standard Fur Cutting Co., 154 A. at 155 (where warranty provided that insured had to maintain a watchman's services to make hourly rounds during the night, "the frequency of inspection tours was of obvious materiality, affecting the hazard and risk and inducing a concession in the premium charged"). Because JEM committed a material breach, Seneca's performance, i.e. handling the claim and making payment on the claim, is excused. See Bernstein v. Nemeyer, 213 Conn. 665, 672-73 (1990) ("It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged.").

B.  Seneca did not Waive its Defense

The defendant's argument that Seneca, by continuing to insure JEM, waived its defense to the claim for the February 15, 2003 incident, is unavailing.

"Waiver is the intentional relinquishment of a known right." Wadia Enterprises, Inc. v. Hirschfeld, 224 Conn. 240, 251 (1992). "Waiver need not be express, 'but may consist of acts or conduct from which a waiver may be implied . . . . In other words,

---

circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." Bernstein v. Nemeyer, 213 Conn. 665, 672 n. 8 (1990).

waiver may be inferred from the circumstances if it is reasonable to do so.'" Id. at 252 (citation omitted). See also Town of Andover v. Hartford Accident and Indemnity Co., 217 A.2d 60, 63 (Conn. 1966) ("In the law of insurance, a breach of condition or warranty, out of which avoidance of the policy may be claimed, does not operate automatically to forfeit or avoid the policy, but sets in operation a right of choice. The insurer may elect either to continue or to terminate. The condition or warranty, the breach of which gives such right of avoidance, is subject to waiver either by express agreement or acts of the insurer from which waiver may be implied.")

The evidence shows that Seneca learned in March 2003 that the police were no longer located on the premises. Upon learning this fact, Seneca issued a Notice of Cancellation and only issued a new policy after obtaining further information from JEM, including a representation that the premises were occupied by three tenants. Also, the court notes that the plaintiff has not accurately characterized the 2003-2004 Policy. The defendant did not, as the plaintiff suggests, continue to insure the plaintiff on the same terms, aware of the plaintiff's noncompliance. Rather, the 2003-2004 Policy was issued to insure premises occupied by three tenants and the premium for this policy was higher than that paid for the 2002-2003 Policy. The fact that the 2003-2004 Policy contained the same security provision (which Seneca appeared to know JEM would not follow) as the 2002-2003

Policy does not show an intentional relinquishment of a known right.  Rather, Seneca's actions with respect to the 2002-2003 Policy show an intent to enforce that provision as an integral component of the policy.  The 2003-2004 Policy, by contrast, was issued after a reassessment of the risk and a price adjustment.  Such evidence is more consistent with inclusion of the provision in the 2003-2004 Policy as an oversight, rather than an intent to overlook JEM's prior breach.

The evidence shows that Seneca's conduct was consistent with an intent to enforce the warranty provision contained in the 2002-2003 Policy.  The plaintiff has produced no evidence that could support a finding that there was an express or implied waiver of rights under the 2002-2003 Policy.  Because the First Claim, the Second Claim, and the Third Claim are all based on an alleged failure of Seneca to comply with the terms of the policy (either because of non-breach on part of JEM or waiver on part of Seneca), the defendant is entitled to summary judgment on each of these claims.

### C. Fourth Claim: Declaratory Judgment

The defendant does not address the plaintiff's Fourth Claim, so the defendant has not met its initial burden under Fed. R. Civ. P. 56.  Accordingly, the defendant's motion for summary judgment on this claim is being denied, without prejudice, and with leave to file a supplemental motion for summary judgment addressing the Fourth Claim.

**IV. Conclusion**

For the reasons set above, the defendant's Motion for Summary Judgment (Doc. No. 16) is hereby GRANTED with respect to the First Claim, the Second Claim and the Third Claim, and DENIED without prejudice with respect to Fourth Claim. Any supplemental motion for summary judgment with respect to the Fourth Claim shall be filed by no later than May 1, 2007.

It is so ordered.

Dated this 31st day of March 2007 at Hartford, Connecticut.

```
          /s/AWT
      Alvin W. Thompson
   United States District Judge
```